Thomas E. **PEREZ**, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**PARAGON CONTRACTORS CORPORATION**, Brian Jessop, and James Jessop, Defendants.

Case No. 2:06–cv–00700–TC

United States District Court, D. Utah, Central Division.

Signed 06/01/2016

Amanda A. Berndt, Jeffrey E. Nelson, John K. Mangum, US Attorney's Office, Salt Lake City, UT, Karen E. Bobela, pro hac vice, Alicia A.W. Truman, pro hac vice, Lydia Tzagoloff, pro hac vice, Katherine Vigil, US Department of Labor Office of the Solicitor, Denver, CO, for Plaintiff.

Kenneth A. Okazaki, Deborah Rae Chandler, Jones Waldo Holbrook & McDonough, Rick J. Sutherland, M. Christopher Moon, Jackson Lewis PLLC, Salt Lake City, UT, for Defendants.

## FINDINGS OF FACT CONCLUSIONS OF LAW

Tena Campbell, United States District Judge

### INTRODUCTION

Following an investigation into complaints that Paragon Contractors Corporation (Paragon), a company in Hildale, Utah, was using child labor in violation of the Fair Labor Standards Act (FLSA), the Secretary of Labor (the Secretary) filed this lawsuit. The parties reached an agreement resolving the Secretary's claim. The agreement culminated in a stipulated permanent injunction and order which, on November 29, 2007, the court signed. (Permanent Inj., ECF No. 26.) The order directed that:

> Defendants [Paragon, Brian Jessop and James Jessop] shall not, contrary to Sections 12(c) and 15(a)(4) of the FLSA, employ, suffer or permit minors to work in commerce or in the production of goods for commerce, or in an enterprise engaged in commerce or in the produc-

tion of goods for commerce, within the meaning of the FLSA under conditions constituting oppressive child labor as defined in § 3(*l*) of the FLSA[,] 29 U.S.C. § 203(*l*), and in occupations therein declared to be hazardous as defined in the regulations found at 29 C.F.R. Part 570 (Subparts C and E).

(Id.)

On December 4, 2012, CNN filmed hundreds of children working at the Southern Utah Pecan Ranch (SUPR) in Hurricane, Utah. Upon seeing the video, the Secretary's investigators began an investigation into whether Paragon was involved with the children working at SUPR.

Finally, after a lengthy investigation which required the Secretary to file subpoena-enforcement actions against the Defendants and others, on September 8, 2015, the Secretary filed a motion for an order to show cause why the Defendant s [1] should not be held in contempt for having violated the injunction. The court granted the motion and an evidentiary hearing was held on January 25, 26, and 27, 2016.[2]

From all the evidence considered by the court and the law that applies to that evidence, the court concludes that Defendants Paragon and Brian Jessop are in contempt of court for violation of the court's order of November 29, 2007.

## FINDINGS OF FACT

Brian Jessop is the owner and president of Paragon. His brother, James Jessop, is vice-president. Paragon's usual business is construction. SUPR is a Nevada limited liability company that owned a pecan grove in Hurricane, Utah.

The pecan grove is approximately 125 acres with close to 4500 producing pecan trees. These trees yield anywhere from 160,000 pecans in a good year to 80,000 pecans in a bad year.[3] Yamagata Enterprises controls SUPR and Norman Freeman was the contact person between Yamagata and Paragon.

Beginning in approximately 2008, Paragon and SUPR agreed that Paragon would be responsible for harvesting all the pecans.[4] Brian Jessop negotiated the contract on behalf of Paragon.

In the years before the Paragon and SUPR agreement, SUPR hired workers to harvest the pecans. Following the harvest, the then-manager of the pecan ranch allowed members of the Fundamentalist Church of Jesus Christ of Latter Day Saints (FLDS) community to gather the

---

1. Defendants Paragon and Brian Jessop were named in the motion. James Jessop was not.

2. The court directed the parties to present their direct evidence through affidavits submitted before the hearing. All affiants were required to be present at the hearing for additional examination.

 The parties filed objections to various statements in the opposing affidavits, based primarily on lack of foundation. For the most part, the court bases its findings on the testimony at the hearing and statements in the affidavits that were not objected to. Brian Jessop and Dale Barlow were deposed earlier by the Secretary. In its findings, the court has used parts of that deposition testimony.

3. The parties stipulated that in 2012 the "comingled pecans," that is, some of the pecans that were mechanically harvested and those picked by hand, were sold in interstate commerce. (Stipulation ¶ 5, ECF No. 55.) Also, the testimony established that all of the pecans that were gathered were taken to the shorting shed where they were sorted, hulled and bagged, and then given to SUPR's broker for sale. Only the pecans that were damaged or cracked were not sold.

4. Hearing Exhibit 15 includes all the agreements between Paragon and SUPR. Exhibit 10 is the 2012 agreement. The terms for the agreements for each year were almost identical.

pecans that had fallen to the ground. SUPR permitted the FLDS community members to keep 50% of the pecans gathered; the other 50% went to SUPR. That arrangement with the FLDS church and SUPR ended when Paragon took over the harvesting of the pecans in 2008.

At the hearing, Mr. Freeman was emphatic that the arrangement with the FLDS community had ended. He testified:

Q: I'm not asking or suggesting any of that. I'm simply trying to establish that this whole arrangement of the FLDS community members gleaning nuts from the field continued from before—

A: It did not. In my mind, did not. With a contract, I expected the contractor to pick it up—pick them up, however, tractor, whatever.

Q: Let me see if I understand the distinction you're making. Before you signed this contract, those FLDS community members were gathering nuts, right?

A: Yes.

Q: After you signed the contract, they continued to gather nuts but you felt they were doing it for Paragon rather than for SUPR, is that what you're trying to say?

A: Yes.

(Contempt Hr'g Tr. 146–47, Jan. 25, 2016, ECF No. 89.)

Mr. Freeman outlined in his affidavit the agreement between SUPR and Paragon:

Under the terms of the Contract, Paragon was responsible for harvesting all of the pecans at SUPR, including the tree nuts that are shaken from the trees using tractors with pans and a conveyor system, as well as the tree nuts that miss the pan and fall onto the ground. I have had specific discussions with Brian Jessop regarding the expectation that Paragon harvest both the pecans shaken from the tree as well as the pecans that fall onto the ground. Brian Jessop was aware of and agreed that this was Paragon's obligation under the contract.

(Freeman Aff. ¶ 9, ECF No. 70.)

Under the agreement, SUPR would receive 70% of the proceeds from the sale of the pecans and Paragon 30%.

Paragon hired Dale Barlow to manage and operate the grove in 2011. His duties remained the same in 2012. Before Mr. Barlow took over at SUPR, Keith Dutson was the manager. Brian Jessop testified that "[a]s it relates to Paragon, what Dale [Barlow] was to do at the pecan ranch should have been the same as what Keith did in 2010." (Contempt Hr'g Tr. 222, Jan. 25, 2016, ECF No. 89.)

Dale Barlow's testimony at his depositions and at the hearing was evasive and was often contradicted by other witnesses' testimony. For example, Mr. Barlow insisted that the parents brought their children to work at SUPR and they supervised them at work. (Dale Barlow Aff. ¶ 21, ECF No. 61; Dale Barlow Dep. 39, 40, Jan. 31, 2013.) But children who worked there testified that their parents did not take them to SUPR and were not with them as they worked. Alyssa Bistline, who was a very credible witness, testified that when she was home-schooling thirty-three children in 2012, she was directed to take the children in vans to work at SUPR. She drove the children to the pecan grove and often the children's parents were not there. (Bistline Aff. ¶ 11, ECF No. 62; Contempt Hr'g Tr. 61–63, Jan. 25, 2016, ECF No. 89.)

Ms. Bistline's testimony was confirmed by the testimony of Phoebe Barlow, who worked at SUPR from 2010 to 2012. Phoebe Barlow began at age eleven and stopped when she was thirteen years old.

She testified that in 2011 and 2012, she was driven to SUPR in vans. (Phoebe Barlow Aff. ¶ 11, ECF No. 71.) Moreover, Sheryl Barlow, the mother of several of the minor children testified, "I was usually not present when my children were working at the pecan harvest at SUPR in 2012." (Sheryl Barlow Aff. ¶ 12, ECF No. 72; Contempt Hr'g Tr. 262, Jan. 26, 2016, ECF No. 95.)

Throughout his testimony, Dale Barlow attempted to show that the parents supervised and directed their children as they gathered pecans. His unsupported testimony was simply not credible. The credible testimony established that Dale Barlow directed the children's work, sometimes assisted by his wife, Marsha Barlow. Phoebe Barlow testified:

A: Um, so we would meet every morning at the Foot Hill School before leaving to go down to SUPR. And Dale would give instructions for the day and then he would tell us who would be leading some of the groups. And so we would go down there and Marsha usually had the largest group of the girls. I don't know who led the boys, and there were Faye Barlow or Dorothy Steed, I don't know what her last name is any more, they took small groups a few times but Marsha usually was in charge of the largest group of girls.

Q: So you personally observed Marsha being in charge of a group?

A: Yes, and I personally checked in with her many times.

Q: Okay. And you personally observed Dale Barlow providing instructions?

A: Yes.

Q: Thank you. Paragraph 10 [of the affidavit], you talked about knowing that your brother did work trimming and cleaning up at other times of the year. Did you see him leaving to do that work?

A: Yes, I did, and he came home and talked about it later after, afterwards. So—

THE COURT: Would he be sort of dirty, et cetera, as one would be working?

THE WITNESS: Yes, he would come home all sweaty and dirty.

(Contempt Hr'g Tr. 311–12,. ECF No. 95.)

The court also found Brian Jessop not credible. For example, Mr. Jessop initially denied that he knew his own children worked at SUPR. (Brian Jessop Dep. 109, Jan. 31, 2013.) He later asserted his Fifth Amendment right and refused to answer the question. (Brian Jessop Dep. 9–11, Nov. 13, 2014.) But the credible testimony showed that his children had been seen working at SUPR. (Contempt Hr'g Tr. 74–75, Jan. 25, 2013, ECF No. 89; Phoebe Barlow Aff. ¶ 18, ECF No. 71; Martha Barlow Aff. ¶ 17, ECF No. 68.)

This court is not the first judge in this case to find Brian Jessop not to be a credible witness. During proceedings brought by the Secretary to enforce subpoenas issued to Paragon and Brian Jessop, Magistrate Judge Evelyn Furse wrote: "Mr. Jessop's claimed lack of knowledge [was] disingenuous." Harris v. Paragon Contractors Corp., No. 2:13–cv–00281, slip op. at 2 (D. Utah June 20, 2013) (decision and recommendation to enforce subpoenas). Judge Furse found "Brian Jessop's claim not to know a single person who harvested ground nuts at SUPR lack[ed] believability." Id. at 3. She also found that Mr. Jessop's denial of knowing who the FLDS Bishop was for two months made it clear that "Mr. Jessop simply did not want to provide that information." Id. When reviewing Judge Furse's conclusions for correctness, U.S. District Court Judge Robert Shelby made "the same findings."

Harris v. Paragon Contractors Corp., No. 2:13–cv–00281, slip op. at 3 (D. Utah Aug. 21, 2013) (order adopting Judge Furse's decision and recommendation to enforce subpoenas). Judge Shelby said, "It is simply not credible that Mr. Jessop is unable to name a single person who harvested the ground nuts when the harvest resulted in Mr. Jessop and Paragon's financial gain." Id.

The Defendants attempted to show that the children's work at SUPR was voluntary. But the children's testimony did not support that contention. When asked whether he had a choice to go work at SUPR when his teachers told him to go, Nathan Barlow, who was six years old in 2012, testified that "[w]ell, we really didn't have a choice." (Contempt Hr'g Tr. 277, Jan. 26, 2016, ECF No. 95.) His sister Phoebe Barlow, testified that "[t]here were days when I was given no choice as to whether or not [to] work at the pecan harvest. Even if I did not go, my school was shut down so I could not attend school." (Phoebe Barlow Aff. ¶ 17, ECF No. 71.)

Moreover, hanging over the decision whether to work was the threat of retaliation by the FLDS Church if the members did not follow instructions. Alyssa Bistline said that if she didn't go work as directed by the Church "I was in big trouble." (Contempt Hr'g Tr. 50, Jan. 25, 2016, ECF No. 89.) When asked what kind of trouble she might have been in, she said, "Getting yelled at by my step-dad [James Jessop], losing my family. If I would have rebelled too much, I risked getting kicked out of the community." (Id.) When the court asked Ms. Bistline why she thought she might be kicked out of the community, she answered: "They [her step-father and Lyle Jeffs] said if you rebel or disobey, you will lose your family and you will be removed."

THE COURT: How old were you at that time, the first time you were told?

THE WITNESS: Ever since I was a kid I've been told that.

(Id. at 51.)

Kenneth Benjamin Thomas lived in the Short Creek area and was a member of the FLDS community from 2002 until 2013. He sent five of his children to work at SUPR once they reached the ages of eight or nine. He testified that he sent the children "any time the Church told us to, and they generally worked Monday through Saturday." (Kenneth Ben Thomas Aff. ¶ 6, ECF No. 64.) Like Alyssa Bistline, Mr. Thomas described the pressure that was put on members of the FLDS community to follow the church's direction about their children working at SUPR. When asked whether he and his wife ultimately made the decision whether to send their children to SUPR, he answered:

Q: And you directed the children to go?

A: Yes.

Q: And so, basically, you made the decision for the children whether or not they would participate in the nut harvest or not?

A: According to what the church told us to do.

Q: According to what the church told you. But ultimately it was up to you?

A: That is a very interesting question.

THE COURT: Why is it interesting?

THE WITNESS: So if I was not in good standing with the church, then I would either get in trouble, get corrected, basically bad things could happen.

THE COURT: What bad things could happen if you didn't? Let's say you didn't send your children, what would have happened?

THE WITNESS: Ultimately you could get called in by the bishop's office, just depending on, I guess, my attitude. Then they would say, you know, you need to do what the church asks you to do, all the way up to they could remove me from— or remove my family from me. So yes, I would send my children.

(Contempt Hr'g Tr. 101–02, Jan. 25, 2016, ECF No. 89.)

Sheryl Barlow also felt pressure from the FLDS church to send her children to work at SUPR. She testified that "[d]uring Church meetings, everyone was strongly encouraged to send their children to work at the pecan harvest. If you were not sending your children to work, it was viewed as not doing your part to serve the Lord. The option to attend school instead was taken out when the schools closed down during the harvest. (Sheryl Barlow Aff. ¶ 8, ECF No. 72.)

Her husband, Dowayne Barlow, agreed with her. Although Dowayne Barlow was not living in the Hildale area after July 2012, he had been an active member of the FLDS community until that time. He stated in his affidavit, "Because involvement was mandated by the Church, we felt we had no choice but to require our children to be involved in working at the pecan harvest at SUPR. (Dowayne Barlow Aff. ¶ 12, ECF No. 66.) He explained further at the hearing:

THE WITNESS: In 2009, 2010, and 2011 there was a lot of communications were coming by text messages and later it came by a voice mail message. We were staunch FLDS. We wouldn't want to be out of harmony with directives and certainly the directive and mandate could be exactly the same word in our culture, and we were given directives to have our children attend and participate in these nut harvests by the text messages and by the voice mail messages.

I was also, um, the one that handled the morning classes at our private school that I shared with my brother and many of my brothers and many of the other families, and was made aware of, at that time, that the schools were being asked to participate.

THE COURT: By whom? By the Church?

THE WITNESS: Yes, by the Church leaders.

(Contempt Hr'g Tr. 363–64, Jan. 26, 2016, ECF No. 95.)

Thomas Barlow worked at SUPR in 2012 when he was nine and ten years old. He testified in his affidavit that

I knew when I had to work because during the church meetings Lyle Jeffs [leader of the FLDS church since his brother Warren Jeffs was in prison] or his helpers would announce it was time to work on the ground nuts. We would meet up at the school to go to SUPR. My school was closed the days I worked. We were not given any choice whether or not to work unless you were sick.

(Thomas Barlow Aff. ¶ 14, ECF No. 73.)

Winnie Barlow was told by the church bishop "that he needed our help with the nut harvest." (Winnie Barlow Aff. ¶ 7, ECF No. 74.) She further explained that she had no choice whether she would work at SUPR: "As long as you were not sick, you were expected to be working. I did not have an option to attend school during that time because all the schools were sending kids to the harvest." (Id. ¶ 19.)

Not only were announcements made at church services and meetings that members of the community were needed to work in the nut harvest, but church per-

sonnel left voice mails and texts on members' phones alerting them that the harvest had begun. Mr. Kenneth Thomas gave one of the messages he had recorded in December 12, 2012, to the Secretary's investigators. The recorded message was introduced at the hearing as Plaintiff's Exhibit 9. On it, a man's voice states that "[t]his is a call from the bishop's office. This is a call for all schools to take the rest of the week off at school to help with the nut harvest." The message directed that the workers were to meet at the Foot Hill School at eight in the morning and "we need all the available fifteen-passenger vans to also be brought to the Foot Hill School." (Ex. 9.) The message concluded with the advice that "[i]f you have any questions, call Dale Barlow at" his phone number. (Id.)

The children's working conditions were often harsh. A common thread that ran through their testimony was the cold weather. Winnie Barlow testified, "It got really cold while we were working and we were not allowed to sit in the vans and there would be crowds around the port-a-potties because people were warming up there." (Winnie Barlow Aff. ¶ 13, ECF No. 74.) Phoebe Barlow testified that when some of her younger cousins were cold, she tried to take them to the vans to get warm, but Dale Barlow had told them earlier that the vans would be locked and no one was to go into them. (Contempt Hr'g Tr. 315, Jan. 26, 2016, ECF No. 95.) Her sister, Martha Barlow, described the conditions at SUPR in the winter: "When we were working at SUPR in November and December it was really cold and sometimes there were lots of people clogging up the restrooms just trying to get warm." (Martha Barlow Aff. ¶ 11, ECF No. 68.)

There were not enough port-a-potties for all the workers. Phoebe Barlow testified that many times she helped little children with wet pants. (Contempt Hr'g Tr. 324, Jan. 26, 2016, ECF No. 95.)

The children were not allowed rest if they wanted to. Winnie Barlow testified that she could not return to the vans to take a break from the work.

Q: So one of the things that you have put in your declaration is that while you worked you were not allowed to sit in the vans to rest. Can you explain to us how you knew that that was the case?

A: Because I asked to go to the vans to rest and they said no, that we should keep on working.

Q: Okay. And so you kept on working when they told you that?

A: Yes.

Q: All right. And um—

THE COURT: How do you know that people came around to check the vans to make sure no one was in them?

THE WITNESS: Because I snuck back to one of the vans and found out.

THE COURT: You sneaked back. Okay, go ahead.

THE WITNESS: And they came around and told us to get out and get back to work.

(Contempt Hr'g Tr. 291–92, Jan. 26, 2016, ECF No. 95.)

The children often weren't given lunches in 2012. Winnie Barlow remembered that "[m]y experience in 2012 was very similar to working at SUPR in 2010 and 2011. But in 2012 we did not get lunches, as we had in past years; we just got a snack around 4:00. (Winnie Barlow Aff. ¶ 17, ECF No. 74.) "Although lunch was usually at 2:00 p.m., on some days they did not give us lunch until 4:00 in the afternoon. Also because some children didn't eat all of their food, there were times that they quit

bringing lunches and just brought snacks." (Phoebe Barlow Aff. ¶ 12, ECF. No. 71.)

The FLDS community closed their schools for several weeks during the nut harvest. The public schools in the area were not closed. (See Stipulation ¶¶ 6–9, ECF No. 55.)

Children worked with equipment and drove vehicles at SUPR. Dorothy Laub, whose property is adjacent to SUPR, saw young children driving and working near tractors during the 2012 harvest. (Dorothy Laub Aff. ¶ 5, ECF No. 65.) She also saw children between the ages of twelve and fifteen pruning trees. (Id. ¶ 6.)

Thomas Barlow drove ATVs and trucks when he was ten years old. He gathered branches and put them in wood chippers. He saw other children, fourteen or fifteen years old, driving a tractor. (Thomas Barlow Aff. ¶¶ 7, 11, ECF No. 73.) When he was fifteen, in 2012, Austin Barlow drove tractors and trucks at SUPR. His cousin, fourteen years old, drove a tractor. (Austin Barlow Aff. ¶¶ 7, 8, ECF No. 63.)

## CONCLUSIONS OF LAW

### I. Civil contempt

The Secretary "seeks a finding of and remedies appropriate for civil, not criminal, contempt." (Pl.'s Response Def.'s Objn's 2, ECF No. 98.) Because the type of contempt that is at issue is only civil in nature, the Secretary bears a burden to prove the elements clearly and convincingly rather than beyond a reasonable doubt. Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827, 833–34, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); Fed. Trade Comm'n v. Kuykendall, 371 F.3d 745, 754, 756 (10th Cir. 2004) (en banc) ("It is well-established in our circuit that compensatory contempt actions are appropriately held before a judge, applying a clear and convincing standard for liability.").

### II. The Finding of Contempt

To find a party liable of contempt, the moving party must prove that (1) a valid order existed, (2) the other party knew about it, and (3) the other party violated it. Kuykendall, 371 F.3d at 756–57; Reliance Ins. Co. v. Mast Construction Co., 84 F.3d 372, 377 (10th Cir. 1996). After the party moving for sanctions has satisfied its burden, the burden shifts to the alleged contemnor "to show either that he had complied with the order or that he could not comply with it." ClearOne Commc'ns, Inc. v. Bowers, 651 F.3d 1200, 1210 (10th Cir. 2011) (quoting United States v. Ford, 514 F.3d 1047, 1051 (10th Cir. 2008)). All parties agree that the stipulated permanent injunction (ECF No. 26) was a valid order and the Defendants knew about it; the disputed issue here is whether Paragon and Brian Jessop violated the injunction.

### III. The Effect of the Permanent Injunction

The injunction prohibited the Defendants from employing "oppressive child labor" as defined in the FLSA, 29 U.S.C. §§ 201–219 (as amended). As the court interprets the FLSA, it keeps in mind that the U.S. Supreme Court explained, in an early decision interpreting its scope, that the statute's provisions "are remedial and humanitarian in purpose" and that it "must not be interpreted or applied in a narrow, grudging manner." Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944) ("We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others."), cited with approval in Kasten v. Saint–Gobain Performance Plastics Corp.,

563 U.S. 1, 13, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011).[5] "The Act must be liberally construed 'to apply to the furthest reaches consistent with congressional direction." United States v. Elledge, 614 F.2d 247, 251 (10th Cir. 1980) (quoting Mitchell v. Lublin, McGaughy & Assocs., 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959)).

Paragon and Brian Jessop contend they did not violate the FLSA (or the stipulated injunction) because (1) the children were volunteers rather than employees; (2) the exclusive employees of the children—if they were employees at all—were Dale Barlow or the FLDS Church; or (3) the children's labor is allowed because of the FLSA agricultural-work exemptions.

## A. The Children Were Not Volunteers

The FLSA protects employees only. Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 295, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985); Goldberg, v. Whitaker House Co-op., Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (Whittaker, J., dissenting) ("It is clear and undisputed that the [FLSA] does not apply in the absence of an employer-employee relationship."); Hale v. Arizona, 993 F.2d 1387, 1393 (9th Cir. 1993). So if the children were volunteers, rather than employees, the Defendants would not have violated the Act.

Paragon and Brian Jessop claim the children are exempt under the statute for volunteers at non-profit food banks, 29 U.S.C. § 203(e)(5), and the volunteer exemption recognized by the Court in Alamo

Foundation, 471 U.S. at 295, 105 S.Ct. 1953 (applying the economic-realities test to determine that some workers were employees and not volunteers). Since that decision, courts have also applied another test when the potential employer is a public agency. As discussed below, the children who worked at SUPR were not volunteers under any of the three standards.

### 1. Food–Bank Volunteers

██ The food-bank exemption is published in FLSA's definition section. It reads, "[t]he term 'employee' does not include individuals who volunteer their services solely for humanitarian purposes to private non-profit food banks and who receive from the food banks groceries." 29 U.S.C. § 203(e)(5). Although the court normally should interpret exemptions narrowly against the employer, the U.S. Supreme Court held that courts cannot construe general definitions in favor or against the employer. SmithKline Beecham, 132 S.Ct. at 2172 n.21 (text included in footnote 5, supra). From the briefing, and the court's efforts, it appears that no court has applied this exemption until now. The plain meaning of "volunteer" is a person who undertakes a service voluntarily, or under their own choice, will, or consent. See Merriam–Webster's Collegiate Dictionary 1324 (Frederick C. Mish ed., 10th ed. 1995).

The children working at SUPR worked because they were required to. It was not their choice. The FLDS Church pressured the parents in the communities to send their children to SUPR.

**5.** But see Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 132 S.Ct. 2156, 2172 n.21, 183 L.Ed.2d 153 (2012) ("In the past, we have stated that exemptions to the FLSA must be 'plainly and unmistakably within their terms and spirit employers seeking to assert them and their application limited to those [cases] plainly and unmistakably within their terms and spirit.' Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). Petitioners and the [Department of Labor] contend that Arnold requires us to construe the outside salesman exemption narrowly, but Arnold is inapposite where, as here, we are interpreting a general definition that applies throughout the FLSA." (first brackets in original)).

## 2. Volunteers for Commercial Enterprises

■■■ In Alamo Foundation, the Court held that some workers, who were former addicts (among others) working for a religious-based, commercial enterprise, were employees under the FLSA. But the Court made it clear that volunteers were excluded from the Act's prohibitions: "An individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit' is outside the sweep of the Act." 471 U.S. at 295, 105 S.Ct. 1953 (quoting Walling v. Portland Terminal Co., 330 U.S. 148, 152, 67 S.Ct. 639, 91 L.Ed. 809 (1947)). To determine whether the workers for the commercial enterprise were employees, the Court applied the economic-reality test. The six common factors considered under that test include:

> (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; ... (5) the degree of skill required to perform the work ... [and (6) ] the extent to which the work is an integral part of the alleged employer's business.

Johnson v. Unified Gov't, 371 F.3d 723, 729 (10th Cir. 2004) (quoting Dole v. Snell, 875 F.2d 802, 805 (10th Cir. 1989); Doty v. Elias, 733 F.2d 720, 723 (10th Cir. 1984)).[6]

This test is hard to apply to the situation here. But to the extent it does, it shows the children were not volunteers. The children of the FLDS community did not choose to work for their own personal purpose or pleasure. Applying the economic-reality factors, the children fit the definition of employee. The amount of control exerted over the children was substantial. School was called off, they were transported by vans to the farm and not allowed to leave or stop working on cold, miserable days. These children had no opportunity to profit from their labor. No one was paid wages. They were not even given proper meals during their work. For the most part, the seasonal and unskilled labor did not benefit the children in secondary ways; for example, they did not learn a new skill or trade.

## 3. Public Agency Volunteers

■■■ Despite the Court's holding in Alamo Foundation that the economic-reality test should be employed when deciding whether a worker is a volunteer or an employee, a few district courts and the Court of Appeals for the Fourth Circuit have questioned application of the economic-reality test when deciding whether a worker volunteered at a public agency. The Tenth Circuit has not similarly questioned the Alamo Foundation holding. These other courts held that the economic-reality test is more helpful when deciding the employment status of an independent contractor as opposed to a volunteer. Purdham v. Fairfax Cnty. Sch. Bd., 637 F.3d 421, 433–34 (4th Cir. 2011); Cleve-

---

**6.** Courts must weigh the totality of the circumstances, and no one factor is dispositive. Johnson, 371 F.3d at 729 (citing Dole, 875 F.2d at 805). Although the ultimate question of whether a worker is an employee is a matter of law reserved for the court, Johnson, 371 F.3d at 728, the court "must first make findings of the historical facts surrounding the [individuals'] work and then use those findings to make findings as to the six factors set forth above. Findings of this second type ... 'are plainly and simply based on inferences from facts and thus are questions of fact.'" Henderson v. Inter–Chem Coal Co., 41 F.3d 567, 571 (10th Cir. 1994) (quoting Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1044 (5th Cir. 1987)).

land v. City of Elmendorf, SA–02–CA–0395 NN, 2004 WL 305609, at *5–6 (W.D. Tex. Jan. 23, 2004), aff'd, 388 F.3d 522; Todaro v. Township of Union, 27 F.Supp.2d 517, 534–40 (D.N.J. 1998); Rodriguez v. Township of Holiday Lakes, 866 F.Supp. 1012, 1020 (S.D. Tex. 1994) ("[T]he 'economic reality test' is inapplicable to trying to distinguish an employee from a volunteer where no payments at all are made between the parties."). But, these cases turn on whether workers, like coaches or police officers, are volunteering at a public agency, and under those circumstances, the Secretary's regulations provide guidance.[7] Here, no party asserts that the children worked for a public agency, so the regulations are only persuasive authority.

Even if these standards were controlling, the children worked under pressure and coercion. They were not free to leave or not work. Their labor was not voluntary. Paragon and Brian Jessop do not escape the injunction's prohibitions under any of these three volunteer exemptions.

## B. Paragon and Brian Jessop Employed the Children

 Paragon and Brian Jessop, with Dale Barlow as their agent, were employers of the children who worked on the ranch during the harvest and throughout the year. In Utah, one way an agency relationship is formed is when (1) the principal manifests its intent that the agent act on its behalf, (2) the agent consents to so

act, and (3) both parties understand that the agent is subject to the principal's control. Sutton v. Miles, 333 P.3d 1279, 1282 (Utah Ct. App.) cert. denied, 341 P.3d 253 (Utah 2014). Paragon, through Brian Jessop's actions, formed this relationship with Dale Barlow who managed SUPR.

Brian Jessop testified that he hired Dale Barlow to manage SUPR and the pecan harvest just as Keith Dutson had in 2010. Brian Jessop and Dale Barlow sat in the Church congregation meetings where families were instructed to participate in the harvest. Brian Jessop and the FLDS Church made it clear to the parents and the children that Dale Barlow was Paragon's agent. For example, the Church's voicemail to the parents gave Dale Barlow's phone number as the main contact for the harvest. And Dale Barlow operated the gates at the SUPR ranch, letting in the children to harvest the nuts. He also managed the children throughout the harvest. Some of those children were Brian Jessop's own children. Both Brian Jessop and Dale Barlow understood that Dale Barlow acted as Paragon's agent.

The FLDS Church and Brian Jessop used their position in the community to coerce the families and children to work the harvest. After the harvest was completed, it was Paragon and Brian Jessop who benefitted financially. He, as Paragon's director, entered an agreement with Yamagata Enterprises to harvest all the

---

7. One of those regulations reads, in part:
 (a) An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours. Individuals performing hours of service for such a public agency will be considered volunteers . . . .
 (b) Congress did not intend to discourage or impede volunteer activities undertaken

for civic, charitable, or humanitarian purposes, but expressed its wish to prevent any manipulation or abuse of minimum wage or overtime requirements through coercion or undue pressure upon individuals to "volunteer" their services.
 (c) Individuals shall be considered volunteers only where their services are offered freely and without pressure or coercion, direct or implied, from an employer.
"Volunteer" defined, 29 C.F.R § 553.101 (2015).

pecans, and under that agreement, Paragon received 30% of the proceeds. Defendants Paragon and Brian Jessop were the ones who made money from the children's labor; they were the children's employer.

Even if Dale Barlow or the FLDS Church was considered a joint employer of the children, then that would not still mean the Defendants' did not violate the 2007 injunction. The court in Lenroot v. Interstate Bakeries Corp., 146 F.2d 325 (8th Cir. 1945), discussed how employers cannot escape liability by delegating authority to others:

> [T]he Act contains no suggestion that the mere declaration by corporate officers of a policy of obedience to the law, or the absence of a grant of authority by them to the hiring foremen to disobey it, leaves the court with no duty of enforcement. On the contrary, such corporations must be held strictly accountable for the child labor violations of subordinates. Their duty does not end with mere directive communication to such subordinates.

Id. at 328. The Lenroot court continued, quoting Judge Cordozo, "The 'duty rests on the employer to inquire into the conditions prevailing in his business. He does not rid himself of that duty because the extent of the business may preclude his personal supervision .... He must then stand or fall with those whom he selects to act for him.' " Id. (quoting People v. Sheffield Farms–Slawson–Decker Co., 225 N.Y. 25, 121 N.E. 474, 476 (N.Y. 1918)). Accordingly, Paragon and Brian Jessop cannot circumvent the stipulated permanent injunction by blaming Dale Barlow or the FLDS Church as the culpable employers. The FLDS Church provided the child labor and Brian Jessop and Dale Barlow were aware of and complicit with it, as the evidence shows they were, so Paragon and

Brian Jessop violated the FLSA and the injunction.

## C. Most of the Children's Labor Falls Outside the Agricultural Exemption

 The Defendants claim that the children's work falls under 29 U.S.C. § 213(c)(1), the agricultural-work exemptions. When assessing whether any of these exemptions apply to this case, the Defendants bear the burden of proof. Maestas v. Day & Zimmerman, LLC, 664 F.3d 822, 826 (10th Cir. 2012) ("It is the employer's burden to prove that an employee falls 'plainly and unmistakably' within a FLSA exemption.").

Agricultural child labor is sometimes allowed, but it must occur "outside of school hours for the school district where" the child is living while employed. 29 U.S.C. § 213(c)(1). For children under fourteen, there are more protections for the work occurring outside of school hours. Id. § 213(c)(1)(A)–(B). And no matter when the work occurred, the work cannot be hazardous. Id. § 213(c)(2). The court will address these issues in turn.

### 1. Local School Districts Define When School Is in Session

Paragon and Brian Jessop argue that "school hours for the school district where such employee is living," id. § 213(c)(1), means the individual child's home-school hours, and because all the children's schools were dismissed when they were at work, all the child labor occurred outside of school hours.

The plain reading of the provision contemplates a public school district and not the individual home school which the student is attending. The Defendants' interpretation strips meaning from the word "district." Congress did not give the employer or child the freedom to choose the school hours in the district where the child

was currently enrolled or where the child was physically working; instead, Congress limited the choice to only the district in which the child lived. If Congress had intended to have such a personalized school time, it could have used more lenient language. The Defendants' interpretation would allow home-schooling parents to easily circumvent the limitation on the agricultural exemption.

Accordingly, the § 213(c)(1) agricultural exemption is limited to only those times when the students were outside of the hours of public school district where the children lived. As the Secretary, Paragon, and Brian Jessop stipulated, the public schools in the community, where the children lived, were in session during the harvest. (Stipulation ¶¶ 6–9, ECF No. 55.) And the children worked during these school hours. The children often worked outside the school hours; some of that work would also not fall within the agricultural exception. Id. § 213(c)(1)(A)–(C). If relief is sought for the labor occurring after school, more evidence will be needed.

For children fourteen years old and older, the only remaining limitation under the FLSA on their labor is the restriction of particularly hazardous occupations under § 213(c)(2).

## 2. Children Performed Hazardous Work

Section 213(c)(2) declares that the general § 212(c) ban of oppressive child labor still applies despite the agricultural exemption if the child is under sixteen years old and is employed in a particularly hazardous occupation unless the parents, or persons standing in place of the parent, employ the child and the parent or person own or operate the farm. Id. § 213(c)(2).

The Secretary has promulgated rules on what activities are hazardous. Occupations in Agriculture Particularly Hazardous for the Employment of Children Below the Age of 16, 29 C.F.R. §§ 570.70–570.73. Here are the specific rules that apply:

(1) Operating a tractor of over 20 PTO horsepower, or connecting or disconnecting an implement or any of its parts to or from such a tractor.

. . . .

(3) Operating or assisting to operate (including starting, stopping, adjusting, feeding, or any other activity involving physical contact associated with the operation) any of the following machines:

(i) Trencher or earthmoving equipment;

(ii) Fork lift; . . . or

(iv) Power-driven circular, band, or chain saw . . . .

Occupations Involved in Agriculture, 29 C.F.R. § 570.71(a).

As the court found earlier, other children under sixteen worked with this type of hazardous equipment and performed this type of hazardous activity. They operated powerful tractors connected to equipment that shook the pecans from the trees during the mechanical harvest. The children trimmed the pecan trees using a hydraulic boom lift and chainsaws. And they operated a wood chipper as well. These activities were hazardous occupations, and accordingly cannot be included as part of the agricultural exemption.

## CONCLUSION

In all, Defendants Paragon and Brian Jessop violated the 2007 stipulated injunction and the court's order by employing children to work the pecan harvests. The children were not volunteers. Also, much of the work occurred during school hours and was hazardous, so that work does not qualify for FLSA's agricultural exemption.

## ORDER

For these reasons, the court finds Paragon and Brian Jessop are in contempt. In accordance with the court's October 19, 2015 Order (ECF No. 41), the court will accept argument from the parties about what the proper sanction should be. Upon conferring with one another, the parties should submit, by June 15, 2016 at 5:00 PM, a proposed scheduling order for briefing and, if needed, a hearing.